F I L E D

at ___ O'clock & ___ min. ___ M

FEB 2 8 2006

United States Bankruptcy Court
Columbia, South Carolina (37)

# UNITED STATES BANKRUPTCY COURT

## DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| In re:<br><br>T 2 Green, LLC, d/b/a King's Grant Golf Course,<br><br>Debtor. | Case No. 05-05781-W<br><br>Chapter 11 |
| T 2 Green, LLC,<br><br>Plaintiff,<br><br>-vs-<br><br>J.L. Abercrombie, *et al.*,<br><br>Defendants | Adv. No. 05-80154-W |

**ENTERED**

FEB 2 8 2006

**D. H. R.**

## ORDER GRANTING IN PART, DENYING IN PART, DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

This matter comes before the Court on cross motions for summary judgment filed by T 2 Green, LLC ("Debtor") and J.L. Abercrombie, *et al.*, ("Defendants"). This Court has jurisdiction over this proceeding pursuant to 28 U.S.C.A. §§ 1334(a) and (b), and 157 (a) and (b). This adversary proceeding is a core proceeding. 28 U.S.C.A. § 157(b)(2)(A), (M), and (O). Venue of this adversary proceeding is proper in this Court in the District of South Carolina pursuant to 28 U.S.C.A. § 1409(a). Pursuant to Rule 52 of the Federal Rules of Civil Procedure, made applicable to this proceeding by Fed. R. Bankr. P. 7052, the Court makes the following Findings of Fact and Conclusions of Law.[1]

---

[1] The Court notes that to the extent that any of the following Findings of Fact constitute Conclusions of Law, they are adopted as such, and to the extent that any Conclusions of Law constitute Findings of Fact, they are so adopted.

## **FINDINGS OF FACT**

1.      King's Grant on the Ashley is a residential subdivision (the "Subdivision") in Dorchester County, South Carolina.  The individual Defendants are property owners within the Subdivision and members of the homeowner's association ("HOA").

2.      The Subdivision is located on a portion of a tract of land formerly owned and developed by the Ervin Company, a Delaware corporation ("Developer").  The entire tract of land is subject to certain declarations of restrictions, described hereinafter.

3.      On another portion of this tract, the Developer built various recreational amenities (for purposes of this Order, this portion of the tract will be referred to as the "Property"),[2] including a golf course, fairways, club house, swimming pool, and tennis courts ("Club Amenities"),[3] which are described in the declarations of restrictions.

4.      Debtor owns the portion of the tract upon which the Club Amenities are situated.

5.      On September 24, 1970, the Developer executed both the First 1970 Declaration and the Second 1970 Declaration.  The First and Second 1970 Declarations (the "1970 Declarations") were duly recorded in Dorchester County and constitute an agreement between the Developer, and its successors and assigns, and any and all purchasers acquiring any of the residential lots described therein and located in Section One of the Subdivision.

6.      The 1970 Declarations describe the Developer's agreement to establish a general plan of development for the protection of the property and future owners and restrict the use of the property.

---

[2] The Property is never precisely defined in the Recorded Declarations.  It is referred to in the RecordedDeclarations as the "Country Club properties" and the "Kings Grant Country Club."  The parties agree that the tract owned by Debtor is approximately 177 acres.

[3] The Club Amenities are referred to in the Recorded Declarations as the "facilities" of the King's Grant Country Club or the "Country Club properties."

7.    The 1970 Declarations provide that the restrictions are to be construed as restrictive covenants running with the title to the described property which inure to the benefit of, and be binding upon, the heirs, successors and assigns of the acquiring parties and persons.

8.    Section I of the 1970 Declarations, entitled "Restrictions," contains restrictions pertaining to the residential lots in Section One of the Subdivision.  Developer reserved the right to restrict other property within the tract of land to residential use.

9.    Section II, entitled "Maintenance Assessment," describes an annual assessment to provide funds for the maintenance of the common areas of the Subdivision, which are deemed not to include "any golf course, club house, or swimming pool now planned for" the Subdivision.

10.    Section III of the 1970 Declarations, entitled "King's Grant Country Club," contains, in relevant part, the following provisions:

1.    <u>Ownership of Country Club</u>.

The ownership of the King's Grant Country Club, including golf course, fairways, club house, swimming pools, tennis courts, and all recreational facilities planned for King's Grant on the Ashley, shall be exclusive in the Developer, and no other person shall, by the recording of the aforementioned plat of King's Grant on the Ashley, or subsequent plats or sections in King's Grant on the Ashley, or by any permissive use, have any proprietary right, title or interest in and to such property. Except as herein expressly provided to the contrary, Developer shall have complete and sole control and authority to manage and operate the King's Grant Country Club properties in such manner as it sees fit, including but not limited to the right to formulate rules and regulations regarding the use thereof.

2.    <u>Use and Enjoyment</u>

Each owner of a lot in King's Grant on the Ashley, upon payment of the monthly dues prescribed by Developer shall have the right and privilege to designate one Family Unit to use and enjoy the facilities of the King's Grant Country Club. Such privilege shall be exercisable by only one Family Unit [defined in paragraph 3 of the restrictions] for each lot at any given time, regardless of the

number of persons who shall own an interest in a lot at any given time. The Developer specifically reserves the privilege to invite such other persons to use and enjoy the facilities of King's Grant Country Club as it may choose, and Developer further reserves the right to establish such dues structure for both owners of lots in King's Grant on the Ashley and for such persons as are not owners of lots in King's Grant on the Ashley, as it, the Developer, in its sole discretion, may deem reasonable and necessary.

4.   Duration of Privilege

The privilege to use and enjoy the Country Club properties shall run with the title to the lot. Therefore, in the event of the conveyance of a lot to another property owner, the privilege of the former property owner to exercise the privilege of using and enjoying the Country Club properties shall automatically cease and the new property owner shall have such privilege.

5.   Suspension of Privileges

Developer shall have the right to suspend the privilege to use and enjoy the Country Club properties in respect to any owner who is delinquent in his dues or for the infraction of Developer's published rules and regulations.

11.   Section IV of the 1970 Declarations, entitled "General Provisions", contains, in

relevant part, the following provisions:

2.   Enforcement.

If any person, firm or corporation shall violate or attempt to violate any of said restrictions, it shall be lawful for any person, firm or corporation owning any of said lots (or having any interest therein) to prosecute any proceeding at law or in equity against the person, firm or corporation violating or attempting to violate the same, and either to prevent him, it or them from doing so or to recover damages or other dues for such violation.

4.   Headings and Binding Effect.

Headings are inserted only for convenience and are in no way to be construed as defining, limiting, extending or otherwise modifying or adding to the particular paragraphs to which they refer.  The covenants, agreements and rights set forth herein shall be binding upon and inure to the benefit of the respective heirs, executors,

successors and assigns of the Developer and all persons claiming by, through or under Developer.

5.    <u>Duration</u>.

The foregoing restrictions shall be construed as covenants running with the land and shall be binding and effective until January 1, 1996, at which time they shall automatically be extended for successive periods of ten (10) years each unless it is agreed by the vote of a majority in interest of the then owners of the described property to change, amend, or revoke the restrictions in whole or in part. Every purchaser or subsequent grantee of any interest in any property now or hereafter made subject to this Developer [sic], by acceptance of a deed or other conveyance therefor, agrees that the covenants and restrictions of this Declaration may be extended as provided in this Article.

6.    <u>Amendment</u>.

The covenants and restrictions of this Declaration may be amended at any time and from time to time during the period of any extension and renewal thereof, by an agreement signed (a) by Developer, if it is the owner of any lots then subject thereto, and (b) to the extent permitted by law, by at least fifty-one (51%) per cent of the property owners whose lots are then subject thereto, and (c) by the then owners of the Country Club properties and common areas within King's Grant. Any such amendment shall not become effective until the instrument evidencing such change has been filed for record in the Office of the Clerk of Court for Dorchester County, South Carolina. Every purchaser or subsequent grantee of an interest in any property now or hereafter made subject to this Declaration, by acceptance of a deed or other conveyance therefore, agrees that the covenants and restrictions of this Declaration may be amended as provided herein.

7.    <u>Delegation and Assignability</u>.

Developer shall at all times and from time to time have the right to delegate any and all functions herein reserved to Developer. Further, notwithstanding any other provision contained herein to the contrary, Developer shall have the right at all times and from time to time to fully transfer, convey and assign all or any part of its right, title and interest under this Declaration, as well as its right, title and interest (whether real or personal) in and to the Country Club properties and common areas; provided, however, that any such transferee, grantee or assignee shall be deemed to have assumed the same. In the event

of such sale, transfer or conveyance, said Developer shall not be
relieved of liability resulting from his failure to perform or
negligence in its obligations under these covenants prior to such sale,
transfer or conveyance. Such Developer shall not, however, be liable
to any person for any injury or loss resulting from failure of
performance or negligent performance of the Developer's obligations
under these covenants arising after such sale, transfer or conveyance.

9.      Provisions of Supplemental and other Declarations.

Any such supplemental declaration to this Declaration or any such
other declaration (including any supplemental declaration thereto)
may set forth and/or provide for the same covenants and restrictions
set forth in this Declaration; provided, however, any such
supplemental declaration to this Declaration, or any such other
declaration (including any supplemental declaration thereto) may
contain such modifications of the covenants and restrictions set forth
in this Declaration and such additional provisions as may be
necessary to reflect the different character, if any, of the property
subject thereto; provided, further, any such instrument shall not
revoke, modify or add to the covenants and restrictions hereby made
applicable to the lots described herein."

12.      On December 19, 1972, the Developer executed a Declaration of Restrictions

King's Grant on the Ashley Section Two (the "1972 Declaration"). The 1972 Declaration was

recorded on December 27, 1972 in Book 206 at Page 42. Pursuant to the 1972 Declaration,

substantially the same covenants and restrictions as contained in the 1970 Declarations were

made applicable to the Section Two lots described therein.

13.      On June 16, 1973, the Developer executed a Declaration of Restrictions King's

Grant Patio Houses (the "June 1973 Declaration"). The June 1973 Declaration was recorded in

Book 214 at Page 46. Pursuant to the June 1973 Declaration, substantially the same covenants

and restrictions as contained in the 1970 Declarations were made applicable to the lots described

therein within the "Patio Houses" Section of the Subdivision.

14.      On October 22, 1973, the Developer executed another Declaration of Restrictions

King's Grant Patio Houses (the "October 1973 Declaration"). The October 1973 Declaration

was recorded on October 23, 1973 in Book 219 at Page 410.  Pursuant to the October 1973 Declaration, substantially the same covenants and restrictions as contained in the 1970 Declarations were made applicable to lots within the "Patio Houses" Section of the Subdivision, which had been previously excluded from the June 1973 Declaration.

15.    On October 31, 1973, the Developer executed a Declaration of Restrictions Portions of King's Grant on the Ashley, Section Two, which was recorded on November 5, 1973 in Book 220 at Page 157 (the "November 1973 Declaration").  Pursuant to the November 1973 Declaration, substantially the same covenants and restrictions as contained in the 1970 Declarations were made applicable to certain lots within Section Two of the Subdivision, which had been previously excluded from the 1972 Declaration (hereinafter each of the referred to declarations shall be collectively referred to as the "Recorded Declarations").

16.    On May 23, 1974, Thomas G. Lynch and Joan E. Lynch, residents of the Subdivision, filed a Complaint against the Developer in the United States District Court for the District of South Carolina, Charleston Division, Civil Action Number 74-644 (the "Lynch Suit").  Among other relief, the Lynches asked the District Court to order the Developer to specifically perform their alleged obligations to provide "a private country club, private golf course and a village shopping center" and to enjoin the Developer from "the continued operation of the convenience store."

17.    On May 5, 1975, the attorneys representing the Lynches and the Developer in the Lynch Suit signed a Memorandum of Agreement.  In the Memorandum of Agreement, the parties agreed to "take whatever action is necessary to modify or supplement that certain Declaration Of Restrictions – King's Grant On The Ashley."  The Memorandum of Agreement stated the parties' intention to modify Section III of the 1970 Declaration to provide, among

other things, that "no person will be allowed to use the facilities of King's Grant Country Club unless they are members of the King's Grant Country Club or guests of member." The Memorandum of Agreement was recorded June 3, 1975 in Book 257 at Page 1.

18.    The Developer and Thomas Lynch, as vice-president of the King's Grant Homeowner's Association, executed an Amendment of Declaration of Restrictions of King's Grant on the Ashley (the "1975 Amendment"). The 1975 Amendment states the Property, "including the golf course, fairways, club house, pool, tennis courts, and all recreational facilities planned for the Subdivision shall be used only for the purposes of a private country club with membership defined and limited under the terms of the said Section III of Declaration of Restrictions dated September 24, 1970, as amended herein." The 1975 Amendment further required each Family Unit within the Subdivision to pay monthly dues set by the Developer for use of the Club Amentities. The 1975 Amendment was recorded on June 2, 1975 in Book 256 at Page 343.

19.    Subsequent to the 1975 Amendment, the Developer and its successors in title did not operate the Property as a private country club and residents of the Subdivision have not been required to pay monthly membership dues to the owner of the Property.

20.    The Developer developed financial problems and eventually filed bankruptcy. By deed recorded on February 26, 1976 in Book 275, Page 339, the Developer transferred the Property to Quail Arbor Estates Corp., a South Carolina corporation operated by Everett Knight ("Quail Arbor"). In connection with the sale of the Property to Quail Arbor, a plat was prepared. The plat was recorded in Dorchester County in Plat Book 23 at Page 4 ("1976 Plat"). The 1976 Plat describes the Property as "King's Grant Golf Course Tract IV 177.013 AC." The

conveyance to Quail Arbor was made subject to "all restrictions, easements and other matters of record." and the property description referenced the 1976 Plat.

21.    By Deed dated February 27, 1976, Quail Arbor conveyed the Property to King's Grant Country Club, a Partnership having Everett Knight and Bufort Blanton as its partners. The conveyance was made subject to "all restrictions, easements and other matters of record," and the property description referenced the 1976 Plat.

22.    The Partnership called King's Grant Country Club ("KGCC") operated the Property as a semi-private Club and golf course from 1976-1997, whereby KGCC allowed individuals from outside of the Subdivision to join KGCC and KGCC allowed public play on the golf course.

23.    KGCC sold the Property to Ashley Oaks of Dorchester, LLC in 1997 for $1,500,000.00. From 1997 until August 2002, Ashley Oaks operated the Property as a semi-private Club and golf course under the name of "River Club on the Ashley." Ashley Oaks also allowed public play on the golf course.

24.    Debtor is a limited liability company, which is owned by members of the Meeks family, including John Meeks. John Meeks has been involved in the golf course industry for twenty-nine years, including employment as a general manager and as a consultant.

25.    Debtor bought the Property from Ashley Oaks in August 2002 for $2,490,000.00.

26.    Debtor operated the Property as a public golf course. Debtor made improvements to the golf course, conducted a membership drive, and advertised, but Debtor was unable to generate a profit.

27.    Residents of the Subdivision have a right to use the amenities on the Property subject to the payment of dues. Some of the residents of the Subdivision have utilized the Club

9

Amenities. The combination of revenues generated from the operation of the Property as a public golf course and revenues generated from residents' memberships have been insufficient to properly sustain the amenities.

28.    Debtor filed its Chapter 11 Bankruptcy petition on May 17, 2005. Debtor is a Debtor in possession pursuant to 11 U.S.C. §§ 1107(a) and 1108.

29.    Debtor originally brought this action for a declaration that the Defendants waived their right to enforce the 1975 Amendment because the Property was never operated as a private country club. Debtor asserted that the Property was not restricted in its use by other covenants. After answering, Defendants discovered that there was no evidence that the 1975 Amendment was presented to the homeowners for approval and thus the 1975 Amendment was invalid because it was not ratified by fifty-one percent of the property owners, as required by the Recorded Declarations. By Consent Order, the parties have narrowed the issues by eliminating an assertion that the 1975 Amendment was binding and enforceable upon Debtor and its Property. The pivotal remaining issues are whether the use of the Property is restricted pursuant the Recorded Declarations or by implication to use as a golf course, tennis courts, swimming pool and other amenities of a country club; whether Debtor is required to perpetually maintain such amenities; and whether any restriction to have and maintain the amenities is defeated by Debtor's various equitable theories.

30.    Debtor and Defendants have each moved for summary judgment for a declaration that the Property is or is not restricted in its use. Defendants have submitted the affidavits of numerous Subdivision residents and an Affidavit of Joe Lenoir, a Subdivision resident and a former salesperson for the Developer. Debtor submitted the affidavits of John Meeks, a member of the Debtor, and Danny Issac, a principal of Ashley Oaks.

## CONCLUSIONS OF LAW

Federal Rule of Civil Procedure 56(c), made applicable to this proceeding by Fed. R. Bankr. P. 7056, provides that summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Summary judgment is a favored mechanism "to secure the 'just, speedy, and inexpensive determination' of a case." In re Hovis, 325 B.R. 158, 163 (Bankr. D.S.C. 2005), quoting Thompson Everett, Inc. v. Nat'l Cable Adver., L.P., 57 F.3d 1317, 1322-23 (4th Cir. 1995).

When a motion for summary judgment is filed, the Court does not weigh the evidence, but determines if there is a genuine issue for trial. Listak v. Centennial Life Insurance Company, 977 F.Supp. 739, 743 (D.S.C. 1997), (citing Anderson v. Liberty Lobby, Inc. 477 U.S. 242, 249, 106 S. Ct. 2505, 2510, 91 L.Ed. 2d 202 (1986)). The Fourth Circuit has summarized Rule 56 procedure as follows:

> Fed.R.Civ.P. 56 prescribes specific procedures to be followed in submitting evidence for or against a summary judgment motion. These procedures help assure the fair and prompt disposition of cases. They ensure further that neither side in a dispute can unfairly surprise the other with evidence that the other has not had time to consider. They also allow a district court to ascertain, through criteria designed to insure reliability and veracity, that a party has real proof of a claim before proceeding to trial.

Orsi v. Kirkwood, 999 F.2d 86, 91 (4th Cir. 1993).

Regardless of whether a movant may ultimately be responsible for proof and persuasion, the party seeking summary judgment bears an initial burden of demonstrating the absence of a genuine issue of material fact. Bouchat v. Baltimore Ravens Football Club, Inc., 346 F.3d 514, 522 (4th Cir. 2003), cert. denied, 541 U.S. 1042 (2004). Once a moving party has made an initial

showing that there is no general issue of material fact, the burden then shifts to the non-moving party to go beyond the pleadings and set forth affidavits, depositions, answers to interrogatories or admissions to show specific facts indicating a genuine issue for trial.  Campbell v. Capital One Bank (In re Broughton), C/A No. 99-06953-W, Adv. Pro. No. 00-80143, slip op. at 4 (Bankr. D.S.C. Mar. 20, 2001).

As in this case, "[w]here a movant supports its motion with affidavits or other evidence which, unopposed, would establish its right to judgment, the non-movant must proffer countering evidence sufficient to create a genuine factual dispute."  In re Dig It, Inc., 129 B.R. 65, 66 (Bankr. D.S.C. 1991).  "To counter a motion for summary judgment, the nonmovant may not rest on its pleadings or mere allegations of counsel."  Id. at 66-67.  Importantly, the "obligation of the nonmoving party is 'particularly strong when the nonmoving party bears the burden of proof.'"  In re Hovis, 325 B.R. at 163 (quoting Hughes v. Bedsole, 48 F.3d 1376, 1381 (4th Cir. 1995)).  Summary judgment should be granted "against a party who fails to make a showing sufficient to establish the evidence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex Corp. v. Catrett, 447 U.S. 317, 322 (1986).

## I.    WHETHER A RESTRICTION APPLIES

As voluntary contracts, restrictive covenants are enforced unless they are indefinite or contravene public policy.  Seabrook Island Property Owners Assoc. v. Marshland Trust, Inc., 358 S.C. 655, 596 S.E.2d 380, 383 (S.C. Ct. App. 2004).  Restrictive covenants are strictly construed, with all doubts resolved in favor of a free use of property.  See Butler v. Sea Pines Plantation Co., 282 S.C. 113, 317 S.E.2d 464, 468 (S.C. Ct. App. 1984).  However, this rule of strict construction only applies where the parties have failed to state their agreement with clarity and this rule does not apply to defeat the obvious purpose of the restrictions.  See Stanton v. Gulf

Oil Corp., 232 S.C. 148, 101 S.E.2d 250, 251 (S.C. 1957). If language of a restriction is equally capable of two or more different constructions, the construction adopted should be the one that least restricts the use of the property. South Carolina Dept. of Natural Resources v. Town of McClellanville, 345 S.C. 617, 550 S.E.2d 299, 302 (S.C. 2001). "[T]he paramount rule of construction is to ascertain and give effect to the intent of the parties as determined from the whole document." Id.

The determination as to whether a restriction is applicable in the matter before the Court necessarily involves an examination of the language contained in the Recorded Declarations, the rights created therein, and whether any restrictions run with the title.

## A. The Plain Text of the Recorded Declarations Restricts the Use of a Portion of the Property.

Paragraph 2 of Section III grants each lot owner "the right and the privilege to designate one Family Unit to use and enjoy the facilities of the King's Grant Country Club," subject to the payment of membership dues established by Debtor. The privilege to use and enjoy the Club Amenities runs with the title to the Defendants' property. The purpose of this language appears to be to restrict the use of the Property so that Club Amenities will be available to the Defendants and their successors in title upon payment of reasonable dues related to the maintenance of the amenities. This language in Section III evidences something more than a mere right to join a club, which would otherwise be available to the Defendants as members of the public, but rather it evidences a covenant by the Developer that it, and its successors, will provide property on which such amenities will be situated so that these amenities may be used by residents of the Subdivision. By promising in the Recorded Declarations that residents of the Subdivision had the right to use the Club Amenities, the Developer clearly intended to restrict the use of some portion of the Property for the purposes of making the Club Amenities available to the

Defendants. This interpretation of the Recorded Declarations is substantiated by other provisions of the document.

### B.      Club Amenities were planned for the Subdivision.

Paragraph 1 of Section III in the Recorded Declarations, indicates that the King's Grant Country Club, including certain of the Club Amenities- golf course, fairways, club house, swimming pool, tennis courts, and all recreational facilities, are "planned for" the Subdivision. This language also appears in Paragraph 1 of Section II in which Developer excludes from the common areas the golf course, club house, and swimming pool but also notes that these amenities were "planned for" the Subdivision.  This language strongly indicates that the Developer intended for the Defendants, as residents of the Subdivision, to have use of the Club Amenities and that the Developer intended to restrict the use of part of the Property for purposes of providing the Club Amenities to the Subdivision. See e.g., Wall v. Fry, 162 N.C.App. 73, 590 S.E.2d 283, 286 (N.C. Ct. App. 2004) (holding that a developer cannot use restrictive covenants to create the illusion of a high quality subdivision and then shield itself from responsibility by claiming that it did not promise to construct the amenities implied in the covenants and that the covenants did not give rise to an affirmative obligation).

### C.      Recorded Declarations do not provide Debtor with a right to unilaterally terminate the rights of the Defendants.

Debtor is provided with broad discretion in Section III of the Recorded Declarations and is given the right to manage and operate the Club Amenities as it sees fit.  Debtor may also formulate rules and regulations regarding the use of the Club Amenities.  Implicit in this language is that there will actually be amenities for Debtor to manage and operate and for Defendants to use.  See e.g., Marshland Trust, 596 S.E.2d at 383 (implying a duty to act reasonably and in good faith when exercising a right under a restrictive covenant).

The Recorded Declarations do not provide Debtor with the right to unilaterally terminate the rights of the Defendants to use the Club Amenities.  Paragraph 5 of Section III provides Debtor with the authority to "suspend" a homeowner's privilege to use the Country Club properties for non-payment of dues.  "Suspend" is defined as "1. to interrupt, to postpone; defer. 2. to temporarily keep (a person) from … exercising a right or privilege."  BLACK'S LAW DICTIONARY 1460 (7th ed. 1999).  Although Debtor has the right to temporarily prevent the Defendants from exercising their privilege to use the Club Amenities, the Recorded Declarations do not provide Debtor with the right to terminate the Defendants' right of use if the Defendants are delinquent in dues or simply choose not to pay dues.  The only specified method by which Debtor may expressly terminate the right of use is found in Paragraph 6 of Section IV and requires the consent of fifty-one (51%) percent of the property owners within the Subdivision.

### D.      Use of the Property is restricted according to its development.

Finally, the preamble portion of the First 1970 Declaration states, "[t]he Developer has agreed to establish a general plan of development as herein set out and thereby to restrict the use and occupancy of the property for the protection of the property and the future owners." This language does not appear in subsequent declarations; however, it evidences the clear and unambiguous intent by the Developer to restrict the use of the property described in the First 1970 Declaration according to the uses set forth in that declaration.  There appears to be two uses contemplated by the Developer in this declaration for its tract of property- residential and recreational.  A portion of this property was developed for residential use and additional lots were later added and restricted to residential use by subsequent declarations pursuant to Section IV of the Recorded Declarations.  It appears that some portion of this property, now owned by Debtor, was to be developed for recreational use according Section III of the Recorded

Declaration. Therefore, the Court finds that the Property, <u>or some portion thereof</u>, is restricted to recreational use pursuant to the language of the Recorded Declarations.

> **E.    The restrictions run with the title to the Property**

Restrictive covenants run with title to land if: (1) an express intention can be found that the original parties to the development intended for the covenants to run with title to the land; (2) the covenants touch and concern the real property; and (3) the party required to observe the covenant is on either actual or constructive notice of the covenant. <u>See</u> <u>Harbison Community Ass'n v. Mueller</u>, 319 S.C. 99, 459 S.E.2d 860, 862-863 (S.C. Ct. App. 1994).

The preamble to the Recorded Declarations expressly states that the covenants contained therein run with the title lots and that use is restricted for the benefit of future owners. Paragraph 4 of Section III further provides that Defendants' right to use and enjoy the Club Amenities runs with the title to their land. Paragraphs 4 and 5 of Section IV also provide that the covenants contained in the Recorded Declarations are binding on the Developer's successors and all persons claiming by, through, and under the Developer and that the covenants run with title to the land. Therefore, the Court finds that there is express intent that the Developer intended for the covenants to run with title to the Property.

The general test to determine whether a covenant touches and concerns land is if, "the covenantee's legal interest in land is rendered more valuable by the covenant's performance." <u>See</u> <u>Marathon Finance Co. v. HHC Liquidation Corp.</u>, 325 S.C. 589, 483 S.E.2d 757, 776 (S.C. Ct. App. 1997). A covenant that restricts the use of property is ordinarily a covenant that touches and concerns the land. <u>See e.g.</u>, <u>Charping v. J.P. Scurry & Co., Inc.</u>, 296 S.C. 312, 372 S.E.2d 120, 121-122 (S.C. Ct. App. 1988). The covenants in the Recorded Declarations touch and

concern because they provide a benefit to the lots within the Subdivision in that they provide the Defendants with the right to use the recreational facilities on the Property.

Finally, Debtor is on constructive notice of the restrictive covenants. A property owner is charged with constructive notice of any restriction appearing within a chain of title. Mueller, 459 S.E.2d at 863. The Recorded Declarations are in Debtor's chain of title and thus Debtor is on notice of the covenants.

Accordingly, for all of the foregoing reasons, there appears to be no genuine issue of material fact with respect to whether some portion of the Property is restricted to recreational use and the Court will grant summary judgment as to this issue. The express language of the Recorded Declarations provide that various recreational amenities will be situated on the Property for the benefit of the Defendants, and this restriction on the use of the Property is binding on Debtor under South Carolina law. Defendants, upon paying reasonable dues proscribed by Debtor, are entitled to use the facilities of King's Grant Country Club, which are described as "including golf course, fairways, club house, swimming pool, tennis courts, and all recreational facilities." However, whether those facilities are specifically defined to identify the size and scope of such restriction will be addressed hereinafter.

## II.    SPECIFICITY OF RESTRICTION

Despite a finding of the applicability of a restriction, the size, scope, and location of such restriction must be examined in this case. Recent South Carolina Supreme Court case law has outlined the rules for examining the parameters of a restrictive covenant. A restrictive covenant is not to be "enlarged or extended by construction or implication beyond the clear meaning of its terms . . . ." Taylor v. Lindsey, 332 S.C. 1, 4, 498 S.E.2d 862, 864 (S.C. 1998) (citing Forest Land Co. v. Black, 216 S.C. 255, 57 S.E.2d 420, 424 (1950)). Further, a restriction "must be created in express terms or by plain and unmistakable implication, and all such restrictions are to

be strictly construed, with all doubts resolved in favor of the free use of property." Taylor, 332

S.C. at 5, 498 S.E.2d at 864.  See also Town of McClellanville, 345 S.C. at 622, 550 S.E.2d at

302 (citing Taylor and noting that the rules for interpreting restrictive covenants in South

Carolina were explained therein); Butler, 317 S.E.2d at 468.

In Taylor, the Supreme Court examined a restrictive covenant on two lots stating "No

residence to cost less than $10,000.00 shall be erected on said lots . . . ." Certain landowners

brought an action to enjoin the landowner from placing a mobile home on the lot, asserting that

the covenant so prohibits.  Taylor, 332 S.C. at 5, 498 S.E.2d at 864.  The Supreme Court

determined that the covenant should be strictly construed and would not enlarge the restriction

beyond the words stated therein.   The Court further noted that if more specificity in the

restriction was desired by the grantor, the grantor could have so indicated.  Id.

In Town of McClellanville, the deed at issue contained a restriction that a parking area

and boat ramp deeded to a town "remain accessible to and remain available for use by the

public." 345 S.C. at 622, 550 S.E.2d at 302.  Then the town enacted an ordinance requiring users

of the ramp to obtain a permit for a fee, injunctive relief was sought by the grantor.  The grantor

argued that the fee violated the covenant.  The Supreme Court disagreed with the grantor's

argument and would not read into the deed restrictions not created in express terms or by plain

and unmistakable implication.  Id. at 625, 550 S.E.2d at 303.  All doubts are resolved in favor of

the free use of the property.  Id.

Defendants attempt to address the issue of scope through various affidavits.   The

Affidavit of Joe Lenoir states that the Developer induced purchasers to buy a lot within the

Subdivision upon a promise that the buyer had the right to join a semi-private club, which

included an 18 hole golf course, tennis courts, swimming pool, and club house; however, an 18

hole golf course is not expressly promised in the Recorded Declarations. Lenoir further states that he and other sales agents for the Developer represented to buyers that these amenities would be developed and maintained by the Developer but the Developer is given broad discretion in the Recorded Declarations to operate the Club Amenities as it sees fit. Finally, Lenoir states that there were brochures and other marketing materials prepared for buyers, which depicted these amenities yet these documents are not in the record.

Accordingly, the specificity of a restriction appears to be an important factor in determining a particular covenant's reach and application. In the matter before the Court, based upon the present record presented, a question of fact remains as to the scope of the restriction, including issues pertaining to the size, location, and quality of the Club Amenities. Without the benefit of testimony and evidence, as a matter of law, the Court cannot determine these remaining issues, and the Court will therefore deny summary judgment in part.

## III.   THE PROPERTY IS NOT RESTRICTED PURSUANT TO THE 1976 PLAT OR BY THE PREVIOUS USE OF PROPERTY

In addition to arguing the application of the restrictions, the Defendants argue that the 1976 Plat plainly identifies that 177 acres is defined as the area for a golf course. South Carolina law provides that a restriction may arise by implication and by recorded documents such as a plat. See Hamilton v. CCM, Inc., 274 S.C. 152, 263 S.E.2d 378, 380-381 (S.C. 1980) (refusing to impose a restriction based upon a plat when the plat was ambiguous). When a developer sells lots in reference to a plat, there may be an implied easement or dedication of the roads, and like common areas appearing in the plat, for the benefit of the subdivision lot owners, unless an intent clearly appears otherwise. See Briarcliffe Acres v. Briarcliffe Realty Co. Inc., 262 S.C. 599, 206 S.E.2d 886, 895 (S.C. 1974).

There is not sufficient evidence in the record from the affidavits of the Defendants that any of their deeds reference the 1976 Plat. Further, the 1976 Plat does not appear to have been produced for the benefit of the Subdivision residents, but rather was created after the development of the Subdivision and for the benefit of a subsequent purchaser of the Property. Further, the plain language of the Recorded Declarations clearly indicates that the Defendants cannot acquire any proprietary right, title, or interest in the Property by virtue of any plat or any previous use of the Property.   See Butler, 317 S.E.2d at 468-469 (holding unrecorded promotional and sales material did not create an implied easement where buyers were clearly advised that the master plans were not to be construed as permanent designations of property). The Court therefore finds that the use of the Property is not implicitly restricted by the 1976 Plat or by Defendants' previous use of the Property because of the clear language in the Recorded Declarations that prohibit the Defendants from obtaining any proprietary right, title, or interest in the Property based upon the foregoing.

## IV.   DEBTOR'S EQUITABLE DEFENSES RAISE ISSUES OF FACT

In support of its motion for summary judgment, Debtor asserts four equitable defenses to bar Defendants' right to use the Club Amenities.  For reasons set forth herein, the Court denies Debtor's motion for summary judgment under its equitable defenses because there are genuine issues of material fact in dispute.

### A.    Waiver and Abandonment

Debtor argues that Defendants have waived or abandoned any right arising under Section III to use the Club Amenities because Defendants have collectively failed to pay membership dues. Waiver is the "voluntary relinquishment of a right with knowledge of all of the facts- an expression of intention not to demand a certain thing is sufficient to constitute a waiver." South

Carolina Tax Comm'n v. Metropolitan Life Ins. Co., 266 S.C. 34, 40, 221 S.E.2d 522, 524 (S.C.

1975).  Abandonment is the relinquishment a property right.  Witt v. Poole, 182 S.C. 110, 188

S.E. 496, 498-499 (S.C. 1936).  To abandon a property right, "there must be some clear and

unmistakable affirmative act or series of acts indicating a purpose to repudiate ownership."  Id.

188 S.E. at 498 (S.C. 1936).

Defendants argue that they have not waived or abandoned their right to use the Club

Amenities, as evidenced by a prepetition action brought against the Debtor in state court by

residents of the Subdivision and the HOA to enforce the Recorded Declarations.  Defendants

have also produced affidavits indicating that many of the Defendants are willing to pay

reasonable dues to use the Club Amenities.  Viewing the evidence in a light most favorable to the

Defendants, as the non-moving party, the Court denies Debtor's motion for summary judgment

because there is a genuine issue of material fact as to whether Defendants waived or abandoned

any of their rights under the Recorded Declarations.

**B.        Changed Circumstances and Frustration of Purpose**

Debtor also asserts that any restriction on the use of the Property may be lifted on

grounds of changed circumstances and frustration of purpose.  Property restrictions may be

invalidated if the property restricted has undergone such a radical change so as to practically

destroy the essential object and purpose of the restriction.  See Dunlap v. Beaty, 239 S.C. 196,

122 S.E.2d 9, 16 (S.C. 1961).  A party to a contract may likewise be excused from performance

when the object or the purpose of the contract is frustrated because of changed conditions

supervening during the term of the contract.  See 30 S.C. Juris. Contracts § 63 (1999).  Both of

these defenses are based upon the alleged economic non-viability of the Club Amenities and the

Defendants overall failure to use the Club Amenities.

There again appears to be a genuine issue of material fact with regard to these defenses. Defendants' affidavits indicate a willingness to pay reasonable dues to support the Club Amenities.   There is also not sufficient evidence to indicate whether the amenities may be economically viable if Debtor reduced the scope of the amenities or made an effort to collect the dues the Defendants indicate that they are willing to pay.   Therefore, the Court denies Debtor's motion for summary judgment on these defenses because there is a genuine issue of material fact as to whether the Club Amenities are economically viable.

## V.    **CONCLUSION**

Each party advances the argument that the Court may determine the restriction on the Property merely by referencing the Recorded Declarations; however, the Recorded Declarations do not precisely address many issues concerning the scope of the restriction.   While the Court holds that Debtor may not eliminate the recreational facilities, there are numerous issues that are not resolved by the language of the Recorded Declarations pertaining to the size, scope, location, and quality of the Club Amenities.   The Court cannot determine at this time whether Debtor may use a lesser portion of the Property for other purposes.   Further, the Court denies Debtor's motion for summary judgment under its equitable defenses because there are genuine issues of material fact in dispute.   The Court therefore reserves jurisdiction in this matter to determine these remaining issues at trial.   Summary judgment is therefore granted in part and denied in part according to this Order.

**AND IT IS SO ORDERED.**

UNITED STATES BANKRUPTCY JUDGE

Columbia, South Carolina
February 28, 2006